UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DANIEL EDWARDS, SHERIFF OF TANGIPOHOA PARISH, | * | CIVIL ACTION 20-1393 |
| Plaintiff | * | CASE NUMBER: |
| VERSUS | * | DIVISION: |
| THE PEOPLE'S REPUBLIC OF CHINA, | * | |
| THE COMMUNIST PARTY OF CHINA, | | |
| NATIONAL HEALTH COMMISSION | * | |
| OF THE PEOPLE'S REPUBLIC OF | | |
| CHINA, MINISTRY OF EMERGENCY | * | |
| MANAGEMENT OF THE PEOPLE'S | | |
| REPUBLIC OF CHINA, MINISTRY OF | * | |
| CIVIL AFFAIRS OF THE PEOPLE'S | | |
| REPUBLIC OF CHINA, PEOPLE'S | * | |
| GOVERNMENT OF HUBEI | | |
| PROVINCE, PEOPLE'S GOVERNMENT | * | |
| OF WUHAN CITY, THE WUHAN INSTITUTE | | |
| OF VIROLOGY, THE CHINSE ACADEMY OF | * | |
| SCIENCE, and THE CHINESE CENTER FOR | | |
| DISEASE CONTROL AND PREVENTION, | * | |
| Defendants | * | |

*    *    *    *    *    *    *    *

**COMPLAINT-CLASS ACTION WITH JURY DEMAND**

NOW INTO COURT, through undersigned counsel, comes Daniel Edwards, Sheriff of

Tangipahoa Parish, Louisiana, on behalf of himself in his capacity as the Sheriff of Tangipahoa

Parish and on behalf of all Sheriffs in the United States of America, to file this class action

complaint for damages and other equitable relief.

This case arises out of negligence and fraud of Defendants which resulted in a global health

pandemic and economic turmoil associated with COVID-19, a disease caused by novel

coronavirus SARS-CoV-2. The actions and inactions of Defendants have caused Plaintiff, and those similarly situated, to experience economic damages.

## PARTIES

1.   Plaintiff Daniel Edwards is a natural person of the age of majority who is the Sheriff of Tangipahoa Parish.

2.   Defendant People's Republic of China ("PRC") is a foreign state.

3.   Defendant Communist Party of China ("CPC") is a political party in China whose general secretary is the president of the PRC. Upon information and belief, the CPC is not an agency or instrumentality of a foreign state as defined by 28 U.S.C. § 1603(b) in the Foreign Sovereign Immunities Act (hereinafter sometimes referred to as "FSIA" and codified in 28 U.S.C. § 1602, et. seq.)  See, e.g., *Yaodi Hu v. Communist Party of China*, 2012 WL 7160373, at *3 (W.D. Mich. Nov. 20, 2012) (holding that the Communist Party of China is not entitled to immunity under FSIA).

4.   Defendant National Health Commission of the People's Republic of China ("National Health Commission") is a ministry of the PRC's State Council charged with formulating health policies.

5.   Defendant Ministry of Emergency Management of the People's Republic of China ("Ministry of Emergency Management") is a ministry of the PRC's State Council charged with emergency management and emergency rescue.

6.   Defendant Ministry of Civil Affairs of the People's Republic of China ("Ministry of Civil Affairs") is a ministry of the PRC's State Council charged with social and administrative affairs.

7.    The People's Government of Hubei Province ("Hubei Province") is the provincial government of the geographical Hubei province in the PRC.

8.    The People's Government of the City of Wuhan ("City of Wuhan") is the city government of the capital city of Hubei Province in the PRC.

9.    On information and belief, at all relevant times, the PRC, National Health Commission, Ministry of Emergency Management, Ministry of Civil Affairs, Hubei Province, and City of Wuhan (collectivity, the "Chinese Government Defendants") and the CPC acted in concert with one another and acted as agents and/or principals of one another in relation to the conduct described herein.

10.    Defendant Wuhan Institute of Virology ("WIV") is a research institute that studies viruses.

11.    Defendant Chinese Academy of Sciences ("CAS") is the national academy of the natural sciences for the PRC and administers the WIV.

12.    Defendant Chinese Center for Disease Control and Prevention ("Chinese CDC") is an agency of the National Health Commission.

## FACTS RELEVANT TO ALL CLAIMS

13.    The first cases of COVID-19 in the world were identified in Wuhan City located in Hubei Province of the PRC in late 2019.

14.    Genetic sequencing has shown that SARS-COV-2 is 96.2% identical at the whole-genome level to a bat coronavirus identified as BatCoV RaTG13 which had been previously detected in the *Rhinolophus affinis* species of bat from Yunnan province in

China. Consequently, it is generally accepted in the scientific community that bats were the likely origin of SARS-CoV-2.[1]

15.    Defendants have contended that the zoonotic transfer (the transfer from animal to human) of SARS-CoV-2 occurred in the Huanan Seafood Wholesale Market located in Wuhan (hereinafter sometimes referred to as "the seafood market").

16.    Despite Defendants' contentions about the location of zoonotic transfer of SARS-CoV-2, an article published on January 24, 2020, in the medical journal The Lancet that was based on collection and analysis of data regarding patients who had laboratory-confirmed cases of COVID-19 in Wuhan City found that 34% of the cases had no exposure to the seafood market and stated that "[n]o epidemiological link was found between the first patient [who had exposure to the market] and later cases."[2]

17.    The same article in the Lancet noted that "…the outbreak was first reported in late December, 2019, when most bat species in Wuhan are hibernating. Second, no bats were sold or found at the Huanan seafood market…"[3]

---

[1]    Peng Zhou, Xing-Lou Yang.  Xian-Guang Wang, et. al. *A pneumonia outbreak associated with a new coronavirus of probable bat origin* 579 Nature 270 (March 12, 2020) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7095418/

[2]    Prof Chaolin Huang, MD, Yeming Wang, MD, Prof Xingwang Li, MD, Prof. Lili Ren, PhD, Prof. Jianping Zhao, MD. Yi Hu, MD et al. *Clinical features of patients infected with 2019 novel coronavirus in Wuhan, China,* 395 The Lancet 497 (January 24, 2020). Available at https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext

[3]    *Id.*

18.     In January of 2020, Chinese health officials took samples at the seafood market and found evidence of SARS-CoV-2 on wild meat stalls.[4]

19.     On January 23, 2020, Goa Fu, director of the Chinese CDC stated on Chinese state television that everyone should stop eating wild animals and that "[i]t is only a matter of time to find out which is the specific animal [from the seafood market that was the source of zoonic transfer]."[5]

20.     To date, Defendants have not identified a specific animal that was the alleged source of zoonotic transfer of SARS-CoV-2 at the seafood market.

21.     Consequently, while there is evidence that SARS-CoV-2 was spread at the seafood market, there is no evidence that the seafood market was the location of zoonotic transfer of SARS-CoV-2.

22.     Regardless of the location of zoonotic transmission of SARS-CoV-2, SARS-CoV-2 has spread across the world resulting in millions of COVID-19 infections, widespread death, and a catastrophic disruption in commercial activity throughout the world.

23.     As of the filing of this Complaint, COVID-19 infections in the United States total over 1,200,000 and are still rising, deaths as a result of COVID-19 in the United States total over 73,000 and are still rising, and the total economic effect of COVID-19 in the United States is several trillion dollars and is still rising.

---

[4]     Jeremy Page, *Virus Sparks Soul-Searching Over China's Wild Animal Trade,* THE WALL STREET JOURNAL Jan. 26, 2020 available at https://www.wsj.com/articles/virus-sparks-soul-searching-over-chinas-wild-animal-trade-11580055290

[5]     *Id.*

24.     The spread of COVID-19 has caused damages to Plaintiff and all of those similarly situated.

### The WIV Laboratory

25.     The WIV is a research institute administered by the CAS.

26.     The WIV operates a research laboratory located in Wuhan City about 8.6 miles from the seafood market.

27.     The WIV lab includes a biosafety level 4 laboratory (the "WIV lab"), the highest safety classification for laboratories.

28.     Biosafety level 4 laboratories study the deadliest viruses on Earth and must employ rigorous safety measures in order to prevent the escape of deadly viruses from them.

29.     Necessary safety measures at biosafety level-4 laboratories include restricting access to only properly trained and authorized individuals, airlocks for entry and exit to the laboratory, use of gastight cabinets with autoclave portals when handling dangerous materials, use of protective suits by workers with chemical showers after use of the suits followed by personal showers once workers are out of the protective suits before workers come into contact with other people, decontamination of trash before disposal, and other measures.

30.     The WIV lab opened in 2015 and is the only biosafety level 4 laboratory in mainland China.

31.   The WIV lab was built to "focus on the control of emerging diseases, store purified viruses and act as a World Health Organization 'reference laboratory' linked to similar labs around the world."[6]

32.   Dr. Shi Zhengli is the director of the Center for Emerging Infectious Diseases at the WIV lab.[7]

33.   Dr. Zhengli has extensively studied bats and their role in the spread of coronaviruses and has authored many articles on the subject.

34.   Dr. Zhengli and others associated with the WIV lab authored an article published in 2008 regarding the potential for the formation and spread of novel coronaviruses in bat populations as a result as recombination of existing viruses.[8]

35.   Dr. Zhengli and others authored an article published in 2015 detailing a study involving the mutation of a naturally occurring bat virus that resulted in a "chimera" virus that could affect human airway cells in the same way as SARS-CoV.[9]

---

[6]   David Cyranoski, *Inside the Chinese lab poised to study world's most dangerous pathogens* 542 Nature 399 (February 23, 2017) available at https://www.nature.com/news/inside-the-chinese-lab-poised-to-study-world-s-most-dangerous-pathogens-1.21487

[7]   Josh Rogin, *State Department cables warned of safety issues at Wuhan lab studying bat coronaviruses*, THE WASHINGTON POST (April 14, 2020) available at https://www.washingtonpost.com/opinions/2020/04/14/state-department-cables-warned-safety-issues-wuhan-lab-studying-bat-coronaviruses/

[8]   Wuze Ren, Xiuxia Qu,,Wendong Li, Zhenggang Han, Meng Yu, Peng Zhou, Shu-Yi Zhang, Lin-Fa Wang, Hongkui Deng, and Zhengli Shi, *Difference in Receptor Usage between Severe Acute Respiratory Syndrome (SARS) Coronavirus and SARS-Like Coronavirus of Bat Origin* 82(4) J.Vir. 1899 (2008) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2258702/

[9]   Menachery VD, Yount BL Jr, Debbink K, Agnihothram S, Gralinski LE, Plante JA, Graham RL, Scobey T, Ge XY, Donaldson EF, Randell SH, Lanzavecchia A, Marasco WA, Shi ZL, Baric RS, *A SARS-like cluster of circulating bat coronaviruses shows potential for human*

36.    Dr. Zhengli was the subject of an article published in December of 2017 regarding collection of anal swabs and guano of horseshoe bats in Yunnan, China that contained strains of coronaviruses very similar to SARS-CoV.[10]

37.    The "WIV animal facilities" were acknowledged in a study published in 2018 regarding injection of a bat coronaviruses similar to SARS-CoV into piglets.[11]

38.    The WIV lab was the site of a study authored by Dr. Zhengli and other WIV lab personnel published in 2018 regarding efficacy of disinfectants used on a bat coronavirus.[12]

39.    On November 18, 2019, the WIV posted a job posting for a position to work in the research group of Zhou Peng, Ph.D., a team leader who investigated bat virus infection and immunity at the WIV lab. The job posting indicated that bat and immunology research was being conducted at the WIV lab at the time of the posting. The job posting

*emergence*    22(4)    Nat.    Medicine    (April    2016)    available    at https://www.ncbi.nlm.nih.gov/pubmed/26552008

[10]    David Cyranoski, *Bat cave solves mystery of deadly SARS virus — and suggests new outbreak could occur* 552 Nature 15 (December 1, 2017) available at https://www.nature.com/articles/d41586-017-07766-9#ref-CR3

[11]    Peng Zhou, Hang Fan, Tian Lan *Fatal swine acute diarrhoea syndrome caused by an HKU2-related coronavirus of bat origin* 556 Nature 255 (April 12, 2018) available at *https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7094983/pdf/41586_2018_Article_10.pdf*

[12]    Huajun Zhang, Chen Peng, Bobo Liu, Jun Liu, Zhiming Yuan, and Zhengli Shi, *Evaluation of MICRO-CHEM PLUS as a Disinfectant for Biosafety Level 4 Laboratory in China,* 23 Applied Biosafety    32    (March    1,    2018)    available    at https://journals.sagepub.com/doi/pdf/10.1177/1535676018758891

indicated that the main research direction of the research group was to use the bat as the research object to address questions about Ebola and SARS-related coronaviruses.[13]

40.     In December of 2019, the WIV posted a job posting for a position to be directed by Dr. Zhengli at the WIV lab addressing topics that included cross-species infection mechanisms and pathogenicity of coronaviruses and other important viruses transmitted by bats.[14]

41.     On January 21, 2020, the WIV filed a patent application in China for the use of Remdesivir, an anti-viral drug that has since been shown to treat COVID-19.[15]

42.     Prior to the WIV's patent application, the developer of the drug, United States company Gilead, had already applied for a patent on the drug in China including the use of it to treat infections caused by coronaviruses.[16]

43.     In 2018, the United Stated Embassy in Beijing sent diplomats including Jamie Fouss, General Consul of the United States for the United States Consulate in Wuhan, and

---

[13]     Job posting archived at https://archive.is/QU22i (translated to English using Google translate).

[14]     Job posting archived at https://archive.is/g4GQi (translated to English using Google translate).

[15]     Zhang Yan, David Stnaway, *China lab seeks patent on use of Gilead's coronavirus treatment,* U.S. NEWS & WORLD REPORT (February 5, 2020) available at https://www.usnews.com/news/world/articles/2020-02-05/china-lab-seeks-patent-on-use-of-gileads-coronavirus-treatment

[16]     *A Chinese Drugmaker Has Started Mass-Producing an Experimental Drug for COVID-19* BLOOMBERG (February 12, 2020) available at https://time.com/5782633/covid-19-drug-remdesivir-china/

Rick Switzer, the United States Embassy's counselor of environmental, science, technology, and health, for repeated visits to the WIV lab.[17]

44.   As a result of the aforementioned visits to the WIV lab by United States diplomats, two officials from the United States Embassy in China sent diplomatic cables to the United States warning of safety and management weaknesses at the lab due to the serious shortage of appropriately trained technicians and investigators that are needed to operate a high-containment laboratory. One of the cables specifically warned of the WIV lab's work regarding bat coronaviruses and the potential for human transmission.[18]

45.   The diplomatic cables contained a warning that the WIV lab's work on bat coronaviruses represented a risk of a pandemic.[19]

46.   During the visits by United States diplomats to the WIV lab, the diplomats were shown information from Dr. Zhengli regarding transmission of coronaviruses from bats to humans resulting in respiratory disease.[20]

47.   United States President Donald Trump has stated that he has a high degree of confidence that the WIV was the location of zoonotic transfer of SARS-CoV-2.[21]

---

[17]   Josh Rogin, *State Department cables warned of safety issues at Wuhan lab studying bat coronaviruses*, THE WASHINGTON POST (April 14, 2020) available at https://www.washingtonpost.com/opinions/global-opinions/how-did-covid-19-begin-its-initial-origin-story-is-shaky/2020/04/02/1475d488-7521-11ea-87da-77a8136c1a6d_story.html

[18]   *Id.*

[19]   *Id.*

[20]   *Id.*

[21]   Christian Zhao, *Trump says he's seen convincing evidence that coronavirus originated in Wuhan lab, threatens retaliation*, NEWSWEEK (April 30, 2020) available at

48.    United States Secretary of State Michael Pompeo has stated that there is "enormous evidence" that the WIV lab was the location of zoonotic transfer of SARS-Cov2-2.[22]

49.    The infection of humans with a coronavirus has been documented in laboratory settings in China on previous occasions. In 2004, graduate students who worked at the Chinese National Institute of Virology Laboratory in Beijing were infected with SARS-CoV in two separate incidents.[23]

### The CDC Lab

50.    The Chinese CDC operates a lab located in Wuhan City (the "CDC lab") located approximately 2.6 miles from the seafood market.

51.    The CDC lab is a biosafety level 2 laboratory which employs much less stringent protective measures than the WIV lab.

52.    Appropriate safety measures in a biosafety level 2 labs include washing hands, restricting access to the laboratory to workers with specific training, and limited use of biological safety cabinets among other measures.

53.    Biosafety level 2 laboratories generally study agents that can cause mild disease to humans or diseases that are difficult to contract through aerosol contact.

---

https://www.newsweek.com/trump-says-hes-seen-convincing-evidence-that-coronavirus-originated-wuhan-lab-1501336

[22]    Jordan Fabian, Jennifer Jacobs, Iaian Marlow, *Trump Promises 'Conclusive' Report on Virus' China Origin*, BLOOMBERG, (May 4, 2020) available at https://www.bloomberg.com/news/articles/2020-05-03/pompeo-says-enormous-evidence-links-virus-to-wuhan-laboratory

[23]    Jane Parry, *Breaches of safety regulations are probable cause of recent SARS outbreak, WHO says,* 328 BMJ 1222 (May 22, 2004) available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC416634/

54. Jun-Hua Tian, a researcher at the CDC lab, co-authored a study involving *Rhinolophus affinis* bats (the same species of bats in which a coronavirus was observed which is 96.2% identical at the whole-genome level to SARS-COV-2).[24]

55. A Washington Post article published on April 2, 2020, contained quotations from Richard Ebright, a Rutgers microbiologist and biosafety expert, who described a video viewed by him showing Jun-Hua Tian capturing bats in a cave without protective measures and with bat urine dropping on his head.[25]

56. Botao Xiao, Ph.D., a DNA specialist in Wuhan, and Lei Xiao published an article in February of 2020 in which they noted that "an expert in collections" involved in the study involving *Rhinolophus affinis* bats with the initials JHT (the same as Jun-Hua Tian who was a co-author of the study ) once described in an article in 2017 being attacked by bats, having blood splash on his skin, and self-quarantining for fourteen days and also having to quarantine himself on a different occasion due to contact with bat urine.[26]

57. The article authored by Dr. Botao and Lei Xiao opined that

---

[24]    Wen-Ping Guo, Xian-Dan Lin, Wen Wang, Jun-Hua Tian, et. al. *Phylogeny and Origins of Hantaviruses Harbored by Bats, Insectivores, and Rodents,* 9 (2) PLOS Pathogens 1 (February 7, 2013)                                available                                at https://journals.plos.org/plospathogens/article?id=10.1371/journal.ppat.1003159

[25]    Josh Rogin, *State Department cables warned of safety issues at Wuhan lab studying bat coronaviruses*, THE WASHINGTON POST (April 14, 2020) available at https://www.washingtonpost.com/opinions/global-opinions/how-did-covid-19-begin-its-initial-origin-story-is-shaky/2020/04/02/1475d488-7521-11ea-87da-77a8136c1a6d_story.html

[26]    Botoa Xiao and Lei Xiao, The Possible origins of 2019-nCov coronavirus,  Available at https://web.archive.org/web/20200214144447/https://www.researchgate.net/publication/339070128_The_possible_origins_of_2019-nCoV_coronavirus. The article has since been withdrawn.

In summary, somebody was entangled with the evolution of 2019-nCoV [a.k.a. SARS-CoV-2] coronavirus. In addition to origins of natural recombination and intermediate host, the killer coronavirus probably originated from a laboratory in Wuhan. Safety level may need to be reinforced in high risk biohazardous laboratories. Regulations may be taken to relocate these laboratories far away from city center and other densely populated places.[27]

### The Government Defendants and the CPC

58.    On January 3, 2020, the National Health Commission ordered institutions not to publish any information related to the then-unknown disease and ordered labs to transfer any samples they had to designated testing institutions, or to destroy them.[28]

59.    On January 5, 2020, Professor Zhang Yongzhen of Fudan University in Shanghai informed the National Health Commission that the virus later named SAR-CoV-2 could be transmitted through a respiratory route. [29]

60.    On January 9, 2020, the Chinese CDC made a preliminary conclusion the disease later named COVID-19 was caused by a new strain of coronavirus.[30]

61.    On January 11, 2020, Prof. Zhang's team became the first to publish the genome sequence of SAR-CoV-2 on public databases Virological.org and GenBank, and the

---

[27]    *Id.*

[28]    Gao Yu, Peng Yanfeng, Yang Rui, Feng Yuding, Ma Danmeng, Flynn Murphy, Han Wei and Timmy Shen, *How early signs of the coronavirus were spotted, spread and throttled in China,* The Straits Times, (Feb. 28, 2020) available at https://www.straitstimes.com/asia/east-asia/how-early-signs-of-the-coronavirus-were-spotted-spread-and-throttled-in-china

[29]    *Id.*

[30]    *Id.*

National Health Commission shared the virus genomic information with the World Health Organization the next day.[31]

62.     Also on January 11, 2020, the City of Wuhan Municipal Health Commission stated there was no evidence of human transmission of infection.[32]

63.     On January 14, 2020, Ma Xiaowei, the head of the National Health Commission, conducted a teleconference with provincial health officials in which he warned that:

   a.   the spread of COVID-19 was likely to develop into a major public health event,

   b.   human-to-human transmission was possible,

   c.   the risk of transmission was high,

   d.   all localities should prepare for and respond to a pandemic, and that

   e.   officials should unite around Xi Jinping, General Secretary of the CPC and President of the PRC.[33]

64.     On January 15, 2020, the Chinese CDC initiated the highest-level emergency response internally.[34]

65.     Also on January 15, 2020, the National Health Commission distributed a 63-page set of instructions to provincial health officials marked "internal," "not to be spread on the internet," and "not to be publicly disclosed" that ordered health officials across

---

[31]     *Id*.

[32]     *Id*.

[33]     The Associated Press, *China didn't warn public of likely pandemic for 6 key days,* (April 15, 2020) available at https://apnews.com/68a9e1b91de4ffc166acd6012d82c2f9

[34]     *Id*.

China to identify suspected cases, ordered hospitals to open fever clinics, and ordered doctors and nurses to don protective gear.[35]

66.    On the same day, Li Qun, the head of the China CDC's emergency center, told Chinese state television that the risk of human-to-human transmission was low.[36]

67.    Five days later, on January 20, 2020, President Xi Jinping made his first public comments stating the outbreak of infection should be taken seriously and an epidemiologist, Zhong Nanshan, announced on national television that the virus was transmissible from person to person.[37]

68.    The United States intelligence community has concluded that Chinese officials intentionally did not provide complete information regarding the number of cases of COVID-19 and deaths resulting from COVID-19 in late 2019 and early 2020.[38]

69.    Dr. Deborah Birx, a United States Department immunologist who is advising the United States President regarding a response to the outbreak of COVID-19, has stated that the Government Defendants' reporting of cases of COVID-19 and deaths resulting from COVID-19 influenced assumptions outside of China, including in the United States, about the nature, incidence rate, and transmission of COVID-19 which resulted in the global health community underestimating the threat posed by COVID-19.[39]

---

[35]    *Id*.

[36]    *Id.*

[37]    *Id.*

[38]    Nick Wadhams and Jennifer Jacobs, *China Concealed Extent of Virus outbreak, U.S. Intelligence Says*, BLOOMBERG (April 1, 2020) available at https://www.bloomberg.com/news/articles/2020-04-01/china-concealed-extent-of-virus-outbreak-u-s-intelligence-says

[39]    *Id.*

70.     On April 17, 2020, Wuhan health officials revised the local death toll upward by 50%.[40]

71.     The PRC, usually an exporter of surgical masks, bought all virtually masks within the manufacturing capacity of private companies in China in the early stages of the outbreak of COVID-19.[41]

72.     United States Department of Homeland Security has concluded that Chinese leaders "intentionally concealed the severity" of the spread of COVID-19 in January of 2020 while purchasing medical supplies.[42]

73.     The PRC specifically denied that it ever issued a regulation prohibiting mask exports.[43]

## JURISDICTION

74.     This Court has subject matter jurisdiction pursuant to Section II of Article III of the United States Constitution which provides that the judicial power of the United States shall extend to all cases between a State, or the citizens thereof, and foreign States, Citizens or Subjects.

---

[40]     Jeremy Page and Wenxin Fan, *Wuhan's Coronavirus Death Toll Surges by 50% After China Revision*, THE WALL STREET JOURNAL (April 17, 2020) available at https://www.wsj.com/articles/wuhans-coronavirus-death-toll-surges-by-50-after-china-reviews-data-11587110435

[41]     Keith Bradsher and Liz Alderman, *China Makes the Masks the World Needs. It Is Just Starting to Share*. THE NEW YORK TIMES Section B, Page 5 (MARCH 14, 2020) available at https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html

[42]     Will Weissert, *DHS report: China hid virus' severity to hoard supplies,* Associated Press (May 3, 2020) available at https://apnews.com/bf685dcf52125be54e030834ab7062a8

[43]     Keith Bradsher and Liz Alderman, *China Makes the Masks the World Needs. It Is Just Starting to Share*. THE NEW YORK TIMES Section B, Page 5(MARCH 14, 2020) available at https://www.nytimes.com/2020/03/13/business/masks-china-coronavirus.html

75. This Court has jurisdiction pursuant to 28 U.S.C. §1330 which provides jurisdiction to district courts over foreign states.

76. FSIA provides the exclusive basis for obtaining subject matter jurisdiction for the claims against, and personal jurisdiction over, the Chinese Government Defendants for the claims asserted by Plaintiff.

77. FSIA provides that foreign states are immune from suit unless one of the statute's specific exclusions apply to the action.

78. FSIA provides that foreign "states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities." 28 U.S.C. §1602.

79. The FSIA defines "commercial activity" in 28 U.S.C. §1603(d) as "either a regular course of commercial conduct or a particular commercial transaction or act" and further provides in the same section that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

80. The Supreme Court has held that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc*. 504 U.S. 607, 614 (1992). The Supreme Court further held that

> because [FSIA] provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," 28 U.S.C. § 1603(d), the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign

state performs (whatever the motive behind them) are the type of actions by which a private party engages in "trade and traffic or commerce…" *Id.*

81.    Stated alternatively, "an activity is commercial unless it is one that only a sovereign state could perform." *Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002)

**Jurisdiction for Claims against Government Defendants and the CPC**

82.    Plaintiff's claims against Government Defendants and the CPC are based on commercial activities that occurred outside the territory of the United States in connection with commercial activities of defendants elsewhere that caused direct effects in the United States pursuant to 28 U.S.C. § 1605(a)-(2).

83.    Specifically, the investigation of health conditions and the dissemination of false information is a commercial activity that can be undertaken by private parties in trade and commerce as evidenced by numerous class actions that have proceeded against drug manufacturers, tobacco companies, chemical manufacturers, and other defendants regarding the investigation of health effects of products and alleged false dissemination of information about them.

84.    The dissemination of false information caused a direct effect in the United States: It led to the spread of COVID-19 to the United States.

85.    Plaintiff's claims against the PRC is also based on the purchase of surgical masks.

86.    The purchase of surgical masks is a commercial activity that can undertaken by private parties in trade and commerce.

87.    PRC's purchase of surgical masks had a direct effect in the United States:  It led to the spread of COVID-19 to the United States.

**Jurisdiction for Claims Against the WIV and Chinese CDC**

88.   Plaintiff's claims against the WIV and the Chinese CDC are based on research activities that occurred in China.

89.   Research into viruses is a commercial activity that can be performed by a private party and which is currently being performed by private parties in connection with efforts to develop medical treatments and a vaccine for COVID-19.

90.   The activities, and failures, of the WIV and the Chinese CDC in connection with the research of viruses had a direct effect in the United States: they led to the release and spread of COVID-19 into the general population including the United States.

91.   Plaintiff's claims against the WIV is also based on the application of the WIV for a patent on Remdesivir for the treatment of COVID-19 in China.

92.   The application for a patent on a drug is a commercial activity that can undertaken by private parties in trade and commerce.

93.   WIV's application for a patent on Remdesivir in China had a direct effect in the United States:  It led to the spread of COVID-19 to the United States by creating financial uncertainty for the developer of the drug, United States company Gilead, which had already applied for a patent on the drug in China.

**VENUE**

94.   Venue is proper under 28 U.S.C. 1391(f)(1) because the Eastern District of Louisiana is a judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred." The legislative history of FSIA specifically states that "[i]n cases under section 1605(a) (2), involving a commercial activity abroad that causes a direct effect in the United States, venue would exist wherever the direct effect

generated 'a substantial part of the events' giving rise to the claim." H.R. Rep. 94-1487 at page 32 (1976).

## CAUSES OF ACTION

95.   28 U.S.C. § 1606 provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances…"

96.   The WIV and/or the Chinese CDC were negligent in that:

 a.   The WIV and/or Chinese CDC had a duty to not expose the general population to SARS-CoV-2 and /or COVID-19 in connection with their research related to bats.

 b.   The WIV and/or Chinese CDC breached their duty to not expose the general population to SARS-CoV-2 and /or COVID-19 by engaging in practices regarding bats that created an unreasonable risk of harm of exposing the general population to SARS-CoV-2 and /or COVID-19 and which did in fact expose the general population to SARS-CoV-2 and /or COVID-19.

 c.   The breach of duty by the WIV and/or Chinese CDC caused damage to Plaintiff and those similarly situated.

97.   The Government Defendants and the CPC were negligent in that:

 a.   The Government Defendants and the CPC  respectively and collectively voluntarily assumed duties to properly investigate the nature, incidence rate, and transmission of COVID-19 and provide correct information regarding the nature, incidence rate, and transmission of COVID-19 regardless of the source of the zoonotic transfer of SARS-CoV-2.

 b.   The Government Defendants and the CPC breached their duties to properly investigate the nature, incidence rate, and transmission of COVID-19 and provide

correct information regarding the nature, incidence rate, and transmission of COVID-19.

c.  The breach of duties by Government Defendants and the CPC caused damage to Plaintiff and those similarly situated.

98.  The Government Defendants and the CPC engaged in fraud in that:

a.  The Government Defendants and the CPC respectively and collectively voluntarily assumed duties to properly investigate the nature, incidence rate, and transmission of COVID-19 and provide correct information regarding the nature, incidence rate, and transmission of COVID-19 regardless of the source of the zoonotic transfer of SARS-CoV-2.

b.  Despite information learned by them, the Government Defendants and the CPC knowingly misrepresented information regarding nature, incidence rate, and transmission of COVID-19.

c.  The misrepresentation by the Government Defendants and the CPC were made with the intent to deceive, and

d.  The justified reliance of Plaintiff, and others similarly situated, on the misrepresentations of the Government Defendants and the CPC resulted in damage to Plaintiff.

**DAMAGES**

99.  Pursuant to Section 27 of Article V of the Louisiana Constitution of 1974, Plaintiff is the chief law enforcement officer of Tangipahoa Parish.

100.  Plaintiff is responsible for executing court orders and process in Tangipahoa Parish and is paid fees in connection with these duties.

101.    Plaintiff's collection of fees has been drastically reduced due to the spread of COVID-19.

102.    Plaintiff is the collector of state and parish ad valorem taxes and other taxes and license fees as provided by law in Tangipahoa Parish.

103.    Plaintiff's collection of taxes in Tangipahoa Parish has been drastically reduced due to the spread of COVID-19.

104.    Plaintiff has sustained damages in the form of lost revenue associated with service of citations and other documents, lack of foreclosures and sales, lack of court fees, and decreased tax revenue.

105.    Plaintiff is responsible for operation and maintenance of the Tangipahoa Parish Jail.

106.    Plaintiff has sustained damages in the form of increased costs to isolate and distance prisoners, purchase personal protective equipment for inmates and deputies, clean and sanitize the Tangipahoa Parish Jail, and test employees and prisoners at the Tangipahoa Parish Jail.

107.    Plaintiff has sustained damages in the form of increased costs to pay overtime wages to persons working in place of sick employees.

108.    Plaintiff has sustained damages due to his inability to implement his "work release" program involving prisoners at the Tangipahoa jail due to the spread of COVD-19.

109.    Plaintiff will sustain damages because his sole source of tax revenue, property taxes levied for purposes of funding Sheriff's operations, will be decreased in 2020, a reassessment year, due to the spread of COVID-19 negative impacting property values.

110.    At this time, Plaintiff estimates damages to total $700,000 to date.

111.    Plaintiff has sustained other damages not yet known.

## CLASS ACTION ALLEGATIONS

112.    Plaintiffs will move the Court to certify this case and its causes of action as a class

action pursuant to Rule 23 with the Class defined as follows:

> All Sheriffs in the United States of America, including the State of
> Louisiana, that have sustained, among other things, financial/monetary
> damages and/or losses and/or extra expenses related to the outbreak of
> COVID-19.

113.    Rule 23(a)(1) requires Plaintiff to show that "the class is so numerous that joinder of

all members is impracticable." Upon information and belief, there are over 3000

sheriffs in the United States.

114.    Rule 23(a)(2) requires Plaintiff to show that "there are questions of law or fact common

the class." Facts identified in this Complaint are common to claims of all Class

Members. The ability of any Class Member to recover against any defendant involves

common questions of law.

115.    Rule 23(a)(3) requires that the claims or defenses of the plaintiff are typical of the

claims or defenses of the class. Plaintiff's claim, as parish sheriff, is typical of the claim

of other parish/county sheriffs throughout the United States.

116.     Rule 23(a)(4) requires that the representative parties will fairly and adequately protect

the interests of the class. Plaintiff has an identical interest to all Class Members in

obtaining the relief sought, and Plaintiff is not subject to any unique defenses. Proof of

Plaintiff's claim will also establish the claims of the Class. The undersigned counsel

are competent counsel experienced in class action litigation, mass torts, and complex

litigation involving such widespread harm. Counsel will fairly and adequately protect

the interests of the Class.

117.   Plaintiff's claims are properly certifiable under Rule 23(b)(1) because prosecuting separate actions by Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party opposing the Class, or adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of the other Class Members who are not parties to the individual adjudications, or would substantially impair or impede their ability to protect their interests.

118.   Plaintiff's claims are properly certified pursuant to Rule 23(b)(3) in that: (1) a class action is superior in this case to other methods of dispute resolution; (2) the Class Members have an interest in class adjudication rather than individual adjudication because of their overlapping rights; (3) it is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case; (4) the disparity between the resources of Defendants and Class Members would make prosecution of individual actions a financial hardship on Class Members; (5) the prosecution of separate actions by individual Class Members, or the individual joinder of all Class Members, is impractical and would create a massive and unnecessary burden on the Court's resources; and (6) management of the Class will be efficient and far superior to the management of individual lawsuits. Moreover, currently, the undersigned counsel is unaware of any other pending litigation regarding this controversy with respect to the claims asserted in this case.

## PRAYER FOR RELIEF

WHEREFORE, Daniel Edwards, Sheriff of Tangipahoa Parish, Louisiana, on behalf of himself in his capacity as the Sheriff of Tangipahoa Parish and on behalf of all Sheriffs in the United States of America, prays for a judgment against Defendants granting the following relief:

a.  Certification of the Class under Federal Rule of Civil Procedure 23 and appointment of Plaintiff as representative of the respective Class and its undersigned counsel as Class counsel;

b.  An order requiring that Defendants pay compensatory and other damages to Plaintiff and the Class Members, for their damages and losses identified herein, to the full extent permitted by the law;

c.  An order awarding all damages allowed by any governing statutes or other governing law;

d.  Statutory pre-judgment and post-judgment interest on any amounts awarded;

e.  Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

f.  Such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, in his own capacity as Sheriff of Tangipahoa and on behalf of all other sheriffs in the United States, demands a trial by jury on issues triable by jury.

Respectfully Submitted:


 /s/ William A. Barousse
ROBERT E. COUHIG. JR. (LA. BAR NO. 4439)
couhigre@couhigpartners.com
JONATHAN P. LEMANN (LA. BAR. NO. 26380)
jlemann@couhigpartners.com
DONALD C. MASSEY (LA. BAR NO. 14177), T.A.
dmassey@couhigpartners.com
WILLIAM A. BAROUSSE (LA BAR NO. 29748)
wbarousse@couhigpartners.com
COUHIG PARTNERS, LLC
1100 Poydras Street
Suite 3250
Energy Centre
New Orleans, LA 70163
Telephone: 504-588-1288
Facsimile: 504-588-9750
*Attorneys for Plaintiff*